IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                 Plaintiff,

      Vs.                                    No.  05-40005-02-SAC

ANDREA M. RIOS,

                 Defendant.

MEMORANDUM AND ORDER

The case comes before the court on the defendant's pretrial motion to suppress evidence found in the search of the vehicle she was driving on December 18, 2004.  (Dk. 39).  The government has filed a response opposing the motion.  (Dk. 40).  The parties presented evidence and oral argument in support of their positions on November 16, 2005.  Having reviewed all matters submitted and having researched the relevant law, the court is ready to rule on the motions.

**INDICTMENT**

The defendant Andrea M. Rios and her co-defendant Michael R. Zepeda are charged in a single count indictment with violating 21 U.S.C. § 841(a)(1) on December 18, 2004, in the District of Kansas by possessing with the intent to distribute 117.34 kilograms of marijuana.

**FACTS**

Around 2:30 p.m. on December 18, 2004, Kansas Highway Patrol Trooper Allan Lytton was traveling eastbound in the left lane of Interstate 70 highway near milepost 198 in Russell County, Kansas.  He observed a Chrysler Sedan 300 traveling eastbound in the right lane, and he followed the car from a distance of 250 to 300 feet for approximately one to two minutes.  Trooper Lytton witnessed the Chrysler cross over the fog line that separates the roadway and the shoulder.  Trooper Lytton described the Chrysler as crossing over the fog line by three or four inches at least two times while traveling approximately 100 feet on I-70.  Trooper Lytton testified that the weather, road and traffic conditions existing at the time would not have affected a driver's ability to maintain a single lane of traffic.

Believing that the Chrysler had violated the traffic law that requires a vehicle to be driven as nearly as practicable within a single lane and having concerns that the driver could be impaired, Trooper Lytton turned on his emergency lights which activated the video camera in his car.  The Chrysler pulled over appropriately, and Trooper Lytton walked to the passenger side.  He explained to the defendant and the passenger the reason for the stop and his concern over whether "everything was all right up here."  He requested their driver's licenses, asked whether the vehicle was a rental car and who had rented it,

2

and inquired about their travel plans.  He also asked for the rental agreement and then returned to the patrol car to look over the furnished documents and run a record check.  Trooper Lytton testified that the driver did not appear to be impaired.

Over the next twelve minutes, Trooper Lytton learned from dispatch that the defendant's driver's license was valid.  Noticing that neither the driver's name nor the passenger's name appeared on the car rental agreement as the lessee or an authorized additional driver, Trooper Lytton telephoned Dollar Rental Company in Tulsa, Oklahoma.  A representative with Dollar Rental told the trooper that no additional drivers appeared on the rental contract and that the car should be impounded if the lessee was not present.  Trooper Lytton radioed dispatch to have a tow truck sent to the scene.  Trooper Lytton testified that his actions here in checking the rental car agreement, informing the rental car company when no authorized drivers are present, and acting on the rental car company's request to impound the car were consistent with his practice, with the practice of some other troopers, and with the interdiction training he had received.

As revealed by the videotape of the stop, Trooper Lytton next walked to the driver's door and asked the driver to accompany him back to the patrol car.  Ms. Rios complied with the request.  Trooper Lytton told her that she had not

rented the vehicle and asked who had.  The defendant said her sister had rented the

car.  Trooper Lytton responded that he had contacted the rental car company

which had instructed him to seize the rental car because the lessee was not in the

vehicle and no additional authorized drivers were listed on the agreement.  Trooper

Lytton gave the defendant a warning and returned her driver's license.  When

Trooper Lytton asked about the defendant's travel plans following the

impoundment, the defendant suggested calling the rental car company immediately.

Trooper Lytton said she could call after the car had been towed to Russell,

because the tow truck was in route and the rental car company would be assessed

the towing charges.  Trooper Lytton further explained that he was required to

search the car and make an inventory of its contents before it was impounded and

towed.  At this point, the defendant offered to pay for their own towing of the car,

and Lytton repeated that the towing had already been arranged at the company's

expense.  The defendant became more insistent in asking to telephone the rental car

company immediately so that the matter could be resolved without towing the car,

but the Trooper was firm that the defendant would have this opportunity once the

vehicle had been impounded and towed back to Russell as directed by the

company.

      When a second officer arrived on the scene, Trooper Lytton asked the

4

officer to watch the defendant while he spoke with the male passenger.  After a

couple of questions about the passenger's relationship to the driver, Trooper

Lytton returned the passenger's driver's license and explained that he needed to

make an inventory search before the car was towed and that the passenger would

have to step away from the car during the search.  Trooper Lytton looked around

the passenger area for less than a minute and then released the trunk latch.  Upon

opening the trunk, he observed immediately what he believed was contraband, and

Ms. Rios and her passenger were handcuffed.  Trooper Lytton testified that he

found several bundles of marijuana totaling 256 pounds in the trunk with potpourri

used as a masking agent.

**LAWFULNESS OF STOP**

> The defendant first challenges that the initial stop was unlawful as the

trooper observed no traffic violation and lacked reasonable suspicion or probable

cause to conduct a traffic stop.  A traffic stop is a seizure under the Fourth

Amendment.  *United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003).  Akin

to investigative detentions, routine traffic stops are analyzed under the investigative

detention principles outlined in *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v.*

*Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).  The reasonableness of a stop is

a dual inquiry: (1) "whether the officer's action was justified at its inception," and

(2) whether the officer's action "was reasonably related in scope to the circumstances that first justified the interference." *United States v. Burch*, 153 F.3d 1140, 1141 (10th Cir. 1998) (quotation omitted).

In deciding the validity of the initial stop, the court looks at whether it was "objectively justified." *United States v. Botero-Ospina*, 71 F.3d 783, 788 (10th Cir. 1995) (en banc), *cert. denied*, 518 U.S. 1007 (1996). To be valid, the officer must have either "'(1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (quoting *United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999)). The constitutional reasonableness of a traffic stop does not depend on the officer's actual motive in conducting the stop. *Whren v. United States*, 517 U.S. 806, 812-13 (1996). In short, the initial traffic stop is reasonable if the officer observed a traffic violation or has reasonable articulable suspicion that a traffic or equipment violation occurred. *United States v. Nichols*, 374 F.3d 959, 964 (10th Cir. 2004), *cert. granted and vacated*, 125 S. Ct. 1082 (U.S. 2005), *opinion affirming conviction reinstated*, 410 F.3d 1182 (10th Cir. 2005).

The Tenth Circuit recently summarized the law relevant to the

6

reasonable suspicion standard to be applied in the context of traffic stops:

> Reasonable suspicion requires that an officer provide "some minimal level of objective justification." *I.N.S. v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).  However, an officer with reasonable suspicion need not "rule out the possibility of innocent conduct" as long as the totality of the circumstances suffices to form "a particularized and objective basis" for a traffic stop.  *United States v. Arvizu*, 534 U.S. 266, 277-78, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citation omitted). Moreover, reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.  *See United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989) (quotation omitted).  Finally, reasonable suspicion may rely on information less reliable than that required to show probable cause, *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), and it need not be correct.  *See United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) (upholding a traffic stop based on a reasonable articulable suspicion that a cracked windshield substantially obstructed the driver's view--the standard required by statute--regardless of whether or not the crack actually constituted a violation of the law); *United States v. Allegree*, 175 F.3d 648, 650 (8th Cir. 1999) (upholding a traffic stop based on the mistaken, yet reasonable, belief that defendant had illegal headlights).

*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

Citing *United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996), the defendant argues that an officer does not necessarily have probable cause to stop a car after it observing it cross a traffic line.  The defendant summarily contends the facts of this traffic stop fail to provide a sufficient basis for probable cause. The government contends the trooper had probable cause upon observing the car cross the fog line under road, traffic and weather conditions that made it quite practicable

7

for the car to be driven with a single lane.

The pertinent statute states: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Kan. Stat. Ann. § 8-1522.  The Tenth Circuit in applying a similar statute from Utah found no reasonable suspicion based on an "isolated incident of a vehicle crossing into the emergency lane of a roadway . . . . [where the] road was winding, the terrain mountainous and the weather condition was windy." *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996) (citations omitted).  The Tenth Circuit has had no difficulty distinguishing *Gregory* in subsequent decisions based on the particular driving conditions:

> We agree that under the language of the Kansas statute, when an officer merely observes someone drive a vehicle outside the marked lane, he does not automatically have probable cause to stop that person for a traffic violation. The use of the phrase "as nearly as practicable" in the statute precludes such absolute standards, and requires a fact-specific inquiry to assess whether an officer has probable cause to believe a violation has occurred. . . . However, decisions like *Gregory* do not establish an absolute standard or bright-line rule regarding what conduct constitutes a violation of statutes like Kan. Stat. Ann. § 8-1522, but instead highlight the need to analyze objectively all the surrounding facts and circumstance to determine whether the officer had the probable cause necessary to justify the stop.

*United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999) (upholding probable cause when the motor home drifted twice "onto the shoulder within a quarter mile

8

under optimal road, weather and traffic conditions."); *see United States v. Cline*, 349 F.3d 1276, 1285-87 (10th Cir. 2003) (upholding articulable suspicion when pickup crossed shoulder line one time and there was no proof that wind or other conditions caused the pickup to swerve); *United States v. de la Fuente-Ramos*, 242 F.3d 391, 2000 WL 1717186 (10th Cir. Nov. 16, 2000) (Table) (upholding probable cause when van weaved more than once and distinguishing *Gregory* as involving only one weaving episode under "road and weather conditions that could have caused even an unimpaired motorist to weave."), *cert. denied*, 532 U.S. 936 (2001); *United States v. Rodriguez*, 215 F.3d 1338, 2000 WL 639581 (10th Cir. May 18, 2000) (upholding probable cause where car swerved onto shoulder twice under windy conditions and concluding "that the windy weather conditions alone in this case do not distinguish it from *Ozbirn*.").

In the instant case, the court has no difficulty finding that the trooper had reasonable suspicion to conduct a traffic stop.  Trooper Lytton observed the car twice cross the fog line by several inches within a short distance.  There is no evidence that the defendant's handling of the car was caused by wind, other traffic, or the road conditions.  The relevant stretch of I-70 was straight with only a gradual incline.  The videotape does not show that the wind was strong or gusty.  The defendant's motion to suppress on this ground is denied.

9

**LAWFULNESS OF DETENTION**

Alternatively, the defendant contends Trooper Lytton unlawfully detained her by not simply issuing a ticket and releasing her but rather inserting himself into a civil contract dispute between the defendant, her sister and the rental car company.  The defendant denies the presence of any other indicators of criminal activity.  The defendant insists the Trooper denied her access to her telephone to resolve the contract dispute without impounding the car.  The defendant disputes the Trooper's authority to impound the car and complains the Trooper manipulated the circumstances in order to search the car despite the lack of criminal suspicion and despite the defendant's efforts to resolve the matter without an inventory search.

"Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Its scope must be carefully tailored to its underlying justification.  *United States v. Gutierrez-Daniez*, 131 F.3d 939, 942 (10th Cir. 1997), *cert. denied*, 523 U.S. 1035 (1998).  But, "an officer conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation." *United States v. Zubia-Melendez*, 263

F.3d 1155, 1161 (10th Cir. 2001).  Routine questions about a driver's travel plans

typically do not exceed the scope of an ordinary traffic stop.  *United States v.*

*Bradford*, 423 F.3d 1149, 1156 -1160 (10th Cir. 2005).  Upon issuing a citation or

warning and determining the validity of the driver's license and right to operate the

vehicle, the officer usually must allow the driver to proceed without further delay.

*Patten*, 183 F.3d at 1193. A longer detention for additional questioning is

permissible if the officer has an objectively reasonable and articulable suspicion that

illegal activity has occurred or is occurring, or the initial detention changes to a

consensual encounter.  *United States v. Hunnicutt*, 135 F.3d at 1349.

          The burden rests with the government to prove the reasonableness of

the officer's suspicion.  *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir.

1998).  "A variety of factors may contribute to the formation of an objectively

reasonable suspicion of illegal activity."  *United States v. Hunnicutt*, 135 F.3d at

1349. "The law does not specify a minimum of factors necessary to constitute

reasonable suspicion."  *United States v. Gutierrez-Daniez*, 131 F.3d at 942

(citation omitted).  Arriving at reasonable suspicion is a process dealing with

probabilities, not hard certainties, "'as understood by those versed in the field of

law enforcement.'"  *United States v. Gutierrez-Daniez*, 131 F.3d at 942 (quoting

*United States v. Cortez*, 449 U.S. 411, 418 (1981)).  Instead of closing their eyes to

11

suspicious circumstances, officers may call on their own experience and training to judge facts and even "perceive meaning in actions that appear innocuous to the untrained observer." *United States v. Gutierrez-Daniez*, 131 F.3d at 942 (citation omitted).  On the other hand, "[i]nchoate suspicions and unparticularized hunches . . . do not provide reasonable suspicion ." *United States v. Salzano*, 158 F.3d at 1111 (quotation omitted).  "While the necessary level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, the Fourth Amendment requires some minimal level of objective justification." *United States v. Gutierrez-Daniez*, 131 F.3d at 942 (quotation omitted).

Looking at the factors identified, individually and together, the court must determine whether they "give rise to a reasonable suspicion of criminal activity." *United States v. Salzano*, 158 F.3d at 1111 (citation omitted).  The court "judge[s] the officer's conduct in light of common sense and ordinary human experience." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (citation omitted).  "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Gutierrez-Daniez*, 131 F.3d at 941 (quotation omitted).  Rather than pigeonholing each fact as either innocuous or suspicious, we look at

12

the totality of the circumstances in determining whether reasonable suspicion

justified a longer detention. *United States v. Mendez*, 118 F.3d at 1431.

        Though her driver's license was valid, the defendant failed to produce

any substantial proof of her right to operate the vehicle.  The rental agreement

evidenced that the car was rented to Ms. Heredia, not the defendant.  Trooper

Lytton properly followed through with his investigation into the lawfulness of the

defendant's possession and operation of the car by calling the rental company to

verify that the defendant was authorized to drive the car and detained the defendant

while waiting for the response.  "[H]aving no proof of authority to operate the

vehicle" is a factor that justifies a reasonable detention and further questioning.

*United States v. Hunnicutt*, 135 F.3d at 1345 (and cases cited therein); *see also*

*United States v. Nichols*, 374 F.3d at 965; *United States v. Fernandez*, 18 F.3d

874, 879 (10th Cir. 1994) (listing a number of cases where a "defendant's lack of a

valid registration, license, bill of sale, or some other indicia of proof to lawfully

operate and possess the vehicle . . . [gives] rise to an objectively reasonable

suspicion that the vehicle may be stolen"); *United States v. Garcia*, 52 F. Supp. 2d

1239, 1245-46 (D. Kan. 1999); *see also United States v. Jones*, 44 F.3d 860, 872

(10th Cir. 1995) (A detention of approximately thirty minutes to verify a driver's

license and that a driver is legitimately operating a rental vehicle is justified).

13

Trooper Lytton here had reasonable suspicion of criminal activity taking place as to detain the defendant for additional questioning and to detain the rental car while the rental company was contacted to determine whether the defendant had its authority to operate the car.

**UNLAWFUL SEARCH**

Though neither the lessee nor an authorized driver of the rental car, the defendant asserts she has standing to challenge the impoundment and search because she had the permission of the lessee, Mr. Heredia, to operate the car.  In challenging the inventory search pursuant to the impoundment, the defendant repeats her argument that the Trooper lacked lawful authority to interject himself into this contractual dispute.

The defendant does not have standing to challenge the impoundment and search of the car, because it was rented in Ms. Heredia's name and the defendant's name does not appear as an authorized driver of the vehicle.  *United States v. Edwards*, 242 F.3d 928, 936 (10th Cir. 2001); *United States v. Obregon*, 748 F.2d 1371, 1374-75 (10th Cir. 1984) (holding that the defendant driver lacked a reasonable expectation of privacy in a rental car because it had been rented by a third party and there was no evidence of that the rental company had permitted defendant lawfully to drive the car).  "To establish standing to challenge a car

14

search, the defendant bears the burden of showing that he had a legitimate possessory interest in or a lawful control over the car." *United States v.Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003) (quotation and citation omitted).  Put another way, the proponent bears the burden of establishing "that he gained possession from the owner or someone with authority to grant possession." *United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990), *cert. denied*, 499 U.S. 924 (1991).  The defendant has not carried her burden of showing standing to challenge the car search.  The defendant has not come forth with any proof that she was given permission to drive the car by the person who had rented it.  Thus, she had no "objectively reasonable" expectation of privacy in the vehicle. *United States v. Gama-Bastidas*, 142 F.3d 1233, 1239 (10th Cir. 1998).  Nor has the defendant asserted or shown standing to challenge the seizure of any evidentiary items seized from the rental car.  Even assuming standing, the officer was instructed and authorized by the owner of the rental car to impound it, and the inventory search exception would appear fully applicable here on the impounded rental car.  *See United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003).

IT IS THEREFORE ORDERED that the defendant's pretrial motion to suppress evidence found in the search of the vehicle she was driving on December 18, 2004, (Dk. 39) is denied.

Dated this 22nd day of November, 2005, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge